UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TERRYLLE BLACKSTONE,<br><br>Defendant. | Case No. 23-CR-123 (RDM)<br><br>Sentencing:  October 3, 2024 |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its sentencing recommendation in this case. Given the nature and seriousness of the defendant's offense, the government requests that the Court sentence the defendant to a period of incarceration of 60 months. Such a sentence is warranted in light of the sentencing factors outlined in 18 U.S.C. § 3553(a).

### BACKGROUND

**I.    The Law Firm Scam**

Defendant Terrylle Blackstone was one of the principal perpetrators of a nationwide foreclosure rescue scheme. (PSR ¶¶ 19-20.) In short, the conspirators marketed themselves as a "national law firm" whose "attorneys" could help distressed homeowners remain in their homes. (PSR ¶ 20.) They collected millions of dollars in putative "legal fees." (PSR ¶ 42.) But this "law firm" was little more than a charade. The purported firm never provided legal advice or legal services that had been promised to the victims. (*Id.*) Victims who paid thousands of dollars in recurring monthly fees never even spoke to an attorney and fell further into debt—often losing their homes or filing for personal bankruptcy. (PSR ¶ 43.)

The scammers used at least two names for their company: Synergy Law LLC ("Synergy") and Themis Law PLLC ("Themis"). At that time, Synergy called itself a "national law firm" based in Washington, D.C., even though all of the company's operations were from a boiler room call center in Manassas, Virginia. (PSR ¶ 20.)

At the Manassas office, call center workers conducted phone calls with victims who faced foreclosure. (PSR ¶ 23.) Those workers used scripts to lure victims into "retaining" the law firm for an upfront payment (often between $995 and $1,750) and a recurring monthly payment (often between $595 and $1,200) for as long as Synergy-Themis "represented" the victim. (PSR ¶ 26.) The scripts contained numerous false promises that duped victims into thinking that they were hiring an attorney who would help them save their home. (PSR ¶¶ 24-25.) But once a victim had "hired" the fake law firm and began making payments, the victims never received the assistance of an attorney that they had been promised. In fact, there were no licensed attorneys that worked full-time at the Manassas call center. (PSR ¶¶ 27-28.)

The victims never spoke to an attorney. Attorneys never reviewed the victims' case. The purported firm never provided legal advice or legal services that had been promised to the victims. In some instances, no one from the so-called law firm even contacted the victim's lender on the victim's behalf. Yet the scammers continued to collect monthly payments from victims as "legal fees" for services that were never provided to them. (PSR ¶¶ 26, 28.)

In some instances, when victims faced imminent foreclosure, the defendants directed the victims to file *pro se* Chapter 13 bankruptcy petitions—without the assistance of any attorney—as a last-ditch effort to save their home. (PSR ¶ 28.) In some other instances, Synergy and Themis provided the victims with non-legal bankruptcy petition preparation services, even though the victims had supposedly paid thousands of dollars for the assistance of an attorney. And in other

instances when victims faced imminent foreclosure, Synergy and Themis referred the victims to other attorneys—often co-defendant Babbs —who would have the victims sign a new retainer to represent the victim in bankruptcy and pay additional legal fees beyond all of the fees that the scammers had already collected. (PSR ¶ 38.) But in all cases, the victims never received the legal services from Synergy or Themis that the defendants had promised to provide.

The government has received numerous impact statements that speak to the financial hardship and other trauma that the conspirators caused to the victims of their scam. A few examples are illustrative:

- Victim CJ has written to the Court that Themis Law called them when they were "behind five to six months of mortgage payments." Themis "told [them] to stop making payments to [their] mortgage company." After five months, "nothing was done on their side" and CJ asked Themis to "refund" their fees. Themis never refunded CJ's money. CJ ultimately borrowed money from their parents to save their home. Since this time, CJ has been placed on medications for "severe anxiety, severe depression, and … high blood pressure." "The money that they SWINDLE out of me would have gone to my kid's college." (VIS-CJ (emphasis in original).[1])

- Victim SB reported that they had hired Synergy to help them secure a mortgage modification. Synergy was "supposed to contact [SB's] mortgage company with [SB] on the phone. … They never attempted to contact [SB's] mortgage company, nor did they call [SB] back after [SB] called several times. As a result, [SB] didn't get the modification, which financially devastated [SB]." (VIS-SB.)

- Victim ST has reported that Themis led ST to believe that Themis "was providing legal assistance to save [ST's] home from foreclosure." ST made payments totaling over $4,000 between June and October 2021. However, ST's lender issued a notice of foreclosure in November 2021. ST called Themis multiple times to discuss the matter and left messages, but Themis never returned ST's calls. And ST's home "was still in jeopardy of foreclosure." (VIS-ST.)

---

[1] "VIS-__" refers to a victim impact statement prepared by the victim with those initials. Victim Impact Statements have been submitted to the Court separately under seal.

3

- Victim PC hired Themis when PC "was looking for some legal assistance to maintain the property [PC] owned" and "afraid of becoming homeless." PC realized "after paying several payments and a retaining fee that they were not providing any service to me." Then, "after wasting over $2,000 with them," PC had to a pay more money "to a legitimate legal company" that could help PC stay in PC's home. (VIS-PC.)

- Victim LB hired Themis when they stopped working and could not make payments to LB's lender. LB paid Themis $1,500 up front and $895 for five subsequent months. Themis assured LB that Themis was "working on [LB's] case," but when LB called LB's lender LB learned that the lender "never received any requests for documents." LB stopped paying Themis "because they were not doing anything" on LB's behalf. (VIS-LB.)

- Victim HN hired Synergy "during a time [of] desperate need" and wanted help to save their home. However, Synergy told HN "what amounted to false promises." When HN's home was in foreclosure, Synergy told HN that Synergy had filed for bankruptcy to protect HN's home. This was entirely false; Synergy "did NOT file the bankruptcy." Rather, HN and their spouse "had to take the day off work [and] scramble to the federal building." Nevertheless, "[d]ue to the loss of money paid to Synergy Law, instead of to Wells Fargo, we did end up losing our home." (VIS-HN.)

- Victim LG paid the scammers $1,295 up front and $895 each month thereafter. The scammers promised that they would contact LG's lender "to form a plan for us to prevent foreclosure of our home" but their lender "never heard from [them] in the twelve months we paid the Law Firm." "My Husband and I are in our seventies. We never expected to be scammed and to lose our home. Our mental and physical health has suffered greatly." (VIS-LG.)

In connection with his plea, Blackstone has admitted that he and his co-conspirators "caused substantial financial hardship to more than 25 clients of Synergy Law and Themis Law" (PSR ¶ 43), although the actual number is likely higher than 25 given the thousands of victims of the scheme. And this financial hardship took many forms: victims lost their homes; relocated to less expensive homes; filed for bankruptcy; suffered losses to savings and retirement funds; and incurred substantial harm to their ability to obtain credit. (*Id.*)

4

## II.     Blackstone's Participation

Blackstone began work at the sham law firm in January 2018.  (PSR ¶ 20.)  Blackstone understood all of the company's operations and reported directly to David Maresca, who owned 90 percent of the company.  (PSR ¶¶ 19-21.)  As the Director of Operations, Blackstone supervised approximately 35 people—not one of these people was an attorney.  (PSR ¶ 27.)  Blackstone knew that an attorney never reviewed a client's case as promised.  (PSR ¶ 26.)  And Blackstone also knew that the call center scripts made false promises about legal services that victims would never receive.  (PSR ¶ 26.)

At the time that Blackstone began work at Synergy, the only attorney who was a member of the "firm" was Scott Marinelli who had been barred from the practice law in any jurisdiction since August 2017.[2]  (PSR ¶ 17.)  Blackstone learned that Marinelli no longer had a license to practice law, and knew that this meant Synergy could not continue its operations.  (PSR ¶ 29.)  Blackstone also knew that between January 2019 and June 2019, Marinelli was incarcerated in Pennsylvania, and this also meant Synergy could not operate.  (PSR ¶ 30.)

To fix the problems caused by Marinelli's legal troubles, Blackstone attempted to recruit Person A—relative who was a D.C. government attorney—to be a consultant for Synergy.  But Person A severed all ties with Synergy on about January 8, 2019, once Person A learned that Synergy had misused Person A's name on Synergy mailings along with a fake D.C. Bar number.  (Ex. 1.)

---

[2] *In re Scott Michael Marinelli*, 166 A.3d 1173 (2017). The New Jersey disciplinary rules state that while under suspension, an attorney "shall not practice law in any form…and shall not appear as an attorney before any court, justice, judge, board, commission, division or other public authority or agency"; "shall not furnish legal services … in any way to the public"; and shall "promptly give notice of the suspension … to each client[.]" New Jersey R. Gen. App. 1:20-20.  The New Jersey Office of Attorney Ethics is also required to "promptly transmit notice of final discipline … to the disciplinary enforcement agency of every other jurisdiction in which the [attorney] is known to have been admitted." New Jersey R. Gen. App. 1:20-9(*o*).  On May 29, 2018, the D.C. Court of Appeals issued a reciprocal two-year suspension. *In re Scott M. Marinelli*, 277 A.3d 363 (2022).

Nevertheless, Blackstone appeared as a representative of Synergy before a bankruptcy judge in the Southern District of Texas on February 1, 2019, and stated falsely that Person A was the "managing attorney" at Synergy who had replaced Marinelli. (PSR ¶ 31.) Blackstone also testified falsely during a deposition in another bankruptcy case that Person A had continued to serve as the "in-house" attorney at Synergy until "around March" of 2019. (Ex. 2.)

Blackstone continued to work at the "law firm" until approximately April 2021. (PSR ¶ 42.) During his time in the conspiracy, Blackstone received $159,145.35[3] from various accounts used by the conspirators. (Ex. 3.)

### III. Victims and Their Losses

Every individual who paid money to the fake law firm is a victim of the scheme. Each of those victims paid money believing that they were hiring a law firm that would provide them with legal services. Many of the victims received non-legal assistance with a mortgage modification; non-legal bankruptcy petition preparation; or were ultimately referred elsewhere for assistance without receiving a refund of the fees paid. And many other victims received no services at all. But none of the victims received the legal services that the victims had been promised. During Blackstone's time in the conspiracy, victims of the scheme paid "fees" of at least $12 million for legal services that the victims never received. (PSR ¶ 42.)

---

[3] This total is slightly lower than the total in Mr. Blackstone's Statement of Offense. (ECF 56 ¶ 22.) Based on a further review of the payment information, the government has excluded $4,053.95 in apparent expense reimbursements that Blackstone received.

**SENTENCING GUIDELINES**

As the Court is well aware, although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court must first calculate the Guidelines range applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).

The government and the defendant have agreed upon the following guideline range:

| U.S.S.G. Section | Description | Levels |
|---|---|---|
| 2B1.1(a)(2) / 2X1.1(a) | Base offense level | 6 |
| 2B1.1(b)(1)(G) | Loss Amount: More than $250,000[4] | +12 |
| 2B1.1(b)(2)(A)(ii) | Offense committed through mass marketing and caused substantial financial hardship to more than 25 victims | +6 |
| 2B1.1(b)(9) | Offense involved misrepresentation or other fraudulent action during the course of a bankruptcy proceeding | +2 |
| 3B1.1(c) | Manager or supervisor in criminal activity that involved five or more participants | +3 |
| | TOTAL | 29 |

(ECF 55 at 2-3.) These guidelines yield a total offense score of 29.[5] In the plea agreement, the government agreed that the defendant should receive a two-point reduction for acceptance of responsibility. (ECF 55 at 3.) The defendant has provided the Court with timely notice of his

---

[4] Based on the facts discussed above, the provable loss amount for this defendant exceeds $12 million. That loss amount would result in a 20-point upward adjustment to the base offense level. U.S.S.G. § 2B1.1(b)(1)(K). The resulting total offense score would be 37. However, the ultimate guideline-recommended sentence of 60 months of incarceration would be unchanged by virtue of the statutory maximum. U.S.S.G. §5G1.1(a).

[5] The PSR recommends that the Court's guideline calculation should also include a two-point upward adjustment for the abuse of a position of trust. (PSR ¶ 63.) Accordingly, the PSR calculates the defendant's offense level to be 28. (PSR ¶ 130.) The government submits that such an adjustment is immaterial to the Court's guidelines analysis because the statutory maximum sentence—and resulting guideline sentence—will remain 60 months of incarceration even if that upward adjustment applied. (*Id.*)

intention to enter a guilty plea, thereby permitting the Court and the government to allocate resources efficiently, which warrants an additional one-point reduction. The resulting offense level is 26. (*Id.*)

According to the presentence report, the defendant has had prior traffic infractions but has zero criminal history points. (PSR ¶ 73). His criminal history places him in Category I. (*Id.*). With an offense score of 26 and a criminal history of Category I, the recommended guideline range is 63 to 78 months of incarceration. (ECF 55 at 4.) However, the statutory maximum sentence for a violation of 18 U.S.C. § 371 is five years (60 months) of incarceration. Therefore, the guidelines recommend a term of imprisonment of 60 months. (PSR ¶ 130.)

## STATUTORY FACTORS

As the Court is also well aware, after calculating the applicable Guideline range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

### Nature and Circumstances of the Offense, and its Seriousness

This crime is serious by any measure. Blackstone and his co-conspirators preyed on victims who faced financial struggles by promising that "lawyers" from their "firm" would help

to save their homes. Victims lost not only the money they paid to the scammers—they also lost the very homes that they were trying to save. And the conspirators repeated this scam thousands of times with victims.

When a person hires an attorney or a law firm, they quite reasonably expect that they will receive "competent representation[,] legal knowledge, skill, thoroughness and preparation[.]" ABA Model Rules of Professional Conduct, Rule 1.1. The client expects "reasonable diligence and promptness" from their attorney. *Id.* at Rule 1.3. And that their attorney "shall not make an agreement for, charge, or collect an unreasonable fee." *Id.* at Rule 1.5. Synergy and Themis operated in violation of all of these principles. Victims never received legal services that they had paid for. And the defendants hardly exercised the professional competence that any client would expect when hiring counsel. A crime like this one undermines the legal profession and the efforts the profession has taken to regulate itself. The result is public cynicism and distrust. *See* VIS-SB ("I paid them $1,250 to do nothing … only the trustees and attorneys were compensated, yet I was the victim").

Mr. Blackstone knew that the law firm was a charade; that no attorneys were involved in the daily operations; that victims were being told false promises about the services victims would receive; that client files were never reviewed by attorneys; and that Marinelli was barred from the practice of law and incarcerated during 2019. Blackstone continued his participation in the conspiracy for more than three years. And he further perpetuated the conspiracy by giving false information to a U.S. Bankruptcy Judge. (ECF 56 ¶ 11.) Indeed, for these reasons, Blackstone's criminal conduct warrants a lengthy period of incarceration.

History and Characteristics of the Defendant

The crime that Mr. Blackstone has pleaded guilty to committing was not a single act of aberrant conduct. It required commitment by Mr. Blackstone to perpetrate such a horrible hoax. The statement of offense supporting his guilty plea shows that Blackstone defrauded victims and willingly went to court to provide false information about Synergy's operations. He supervised as many as 40 people in continuing the fraud. And when Mr. Marinelli was incarcerated, Mr. Blackstone attempted to recruit Person A to join the scheme.

According to the probation office, Mr. Blackstone has a negative net worth. (PSR ¶ 119.) He already owes a substantial amount of money to the IRS in unpaid taxes. (*Id.*) He owns no vehicles or property in his own name. (PSR ¶ 121.) And Mr. Blackstone has no meaningful assets that can be used to pay a criminal fine, to make restitution to victims, or to forfeit in satisfaction of a judgment against him. (PSR ¶¶ 119-128.) Accordingly, the only meaningful punishment that the Court can impose is to restrain Mr. Blackstone's personal liberty.

Promotion of Respect for the Law,
General Deterrence, and Avoiding Disparities

The government recommends that this defendant be sentenced to a period of incarceration consistent with the Guideline Range. The Probation Office has not identified any basis for the Court to depart from the guidelines and "has not identified any circumstances that are not adequately considered within the guidelines." (PSR ¶ 153.) Moreover, the Probation Office "has not identified factors that may warrant a variance from the applicable guideline range." (PSR ¶ 154.) Adherence to the sentencing guidelines promotes respect for the law and avoids disparities in sentencing assuring comparable sentences in comparable cases. The Probation Office has also reported that during the last five fiscal years 171 defendants have been

sentenced in similar federal cases under § 2B1.1 with Criminal History in Category I.[6] (PSR ¶155.) Those defendants received an average sentence of 61 months of incarceration, with a median sentence of 60 months of incarceration. (PSR ¶ 155.)

It is also worth noting here the impact of the plea agreement on the ultimate sentence. Mr. Blackstone has pleaded guilty to an information charging an offense with a statutory maximum sentence of 60 months of incarceration. Had Mr. Blackstone been convicted on any of the counts in the indictment, the statutory maximum sentence would have been 240 months of incarceration. *Cf.* 18 USC. §§ 1341, 1343, 1349. And Mr. Blackstone's resulting guideline range would have been well above the government's recommendation and the Probation Office's calculation.

## RESTITUTION AND FORFEITURE

The government is currently providing notice of these proceedings to 4,184 victims through its Victim Notification System. As noted above, collectively the victims of these crimes lost millions of dollars. As of this filing, the government has not been able to gather and compile restitution information for all of these victims. The government asks that the Court order restitution in an amount not greater than $12,349,419, and allow the government an additional 90 days to submit restitution claims on behalf of victims. *Cf.* 18 U.S.C. § 3664(d)(5)("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the government shall so inform the court, and the court shall set a date for the final determination of the victim's losses not to exceed 90 days after sentencing.").

---

[6] The Probation Office has identified comparable cases with an Offense Score of 28 which is based on the inclusion of a two-point upward adjustment under §3B1.3 for the abuse of a position of trust. (PSR ¶ 48.) The parties have not agreed to that adjustment in the plea agreement.

11

Forfeiture is separate from restitution. The Court should enter a forfeiture money judgment against the defendant in the amount of proceeds that the defendant actually obtained from his participation in the scheme. As indicated in the attached table, Mr. Blackstone received $159,145.35 for his participation in the scheme. (Ex. 3.) The government asks that the Court enter a forfeiture money judgment in that amount.

## CONCLUSION

The government recommends that the defendant be sentenced to serve a period of incarceration of 60 months which is consistent with the sentencing guidelines, the conclusions of the Probation Office, and sentencing nationwide for cases like the one at bar. The government also asks that the Court enter orders of restitution and forfeiture.

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney

By: _____
        JOHN W. BORCHERT (Bar No. 472824)
        Assistant United States Attorneys
        Fraud, Public Corruption & Civil Rights Section
        601 D Street, NW
        Washington, D.C. 20530
        (202) 252-7679
        john.borchert@usdoj.gov

September 26, 2024

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the court's ECF system on counsel for the defendant.

_____
JOHN W. BORCHERT
Assistant United States Attorney